UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                        Case No:  3:20-CR-95-J-39MCR

RICHARD EVERETT CAMP, JR.
_____/

**SENTENCING MEMORANDUM**
**AND**
**INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Defendant, Richard Everett Camp, Jr., by and through his

undersigned counsel, and hereby files this Sentencing Memorandum and Incorporated

Memorandum of Law, and in support thereof, states as follows:

**TABLE OF CONTENTS**

A.      Introduction
B.      Background on Richard Everett Camp, Jr.
C.      Cooperation
D.      PSI Objections
E.      Departures and Variance Grounds
F.      Credit for State Time
G.      Memorandum of Law

**MEMORANDUM**

A.      Introduction

1.      This Honorable Court has permitted counsel to file a sentencing

memorandum not exceeding 50 pages, based on a request of counsel, generated by

the unexpected filing, by counsel for his codefendant, Gretchen Camp, on Tuesday, May 18, 2021 (a mere two days prior to her sentencing hearing) of a sentencing memorandum and exhibits totaling <u>599 pages</u>.  The primary purpose of that memo was to fabricate claims of abuse by Mr. Camp, allegedly in support of a factually and legally defective claim that her embezzlement was the product of being an abused wife.

2.      Given the lateness of that filing, its length, and the conflicting schedule of counsel for Mr. Camp,[1] addressing those claims (which, respectfully, strike counsel as a sideshow), will take additional time.

3.      However, the "traditional" sentencing memorandum of Mr. Camp, addressing the topics set forth in the Table of Contents, is ready for filing, since the final PSI was filed three days ago, and counsel has worked overtime to integrate that final PSI with this memorandum, in order to get it to the Court at the earliest possible time.

4.      Thus, this "traditional" sentencing memorandum is being filed, out of

---

[1] As noted, the 599 page Gretchen Camp filing was on Tuesday.  Counsel was in a federal matter, out of state, that entire day.  Gretchen's sentencing hearing was Thursday, and, due to these spurious claims, counsel was obliged to attend that hearing to observe.  Thus, there has been little time to compile a response to these claims, and, of course, counsel hopes to be efficient in doing so, to avoid wasting the Court's time.  Thus, preparation of such a response has been, and will be, time-consuming.

respect to the Court's schedule, and counsel will then file a separate memorandum, addressing the "abuse" claims.  Counsel hopes to get that separate memorandum filed later today, but no later than Monday, May 24, 2021.

B.   Background on Richard Camp

5.   Family Background

Mr. Camp is 37 years of age.  He was born on May 3, 1983, in Jacksonville, to Richard "Rick" Camp and Lou Bentley.  His parents were married for almost 30 years, but divorced seven years ago.  His mother lived in Dublin, Georgia, but is retired and now lives in St. Johns, Florida (right below Jacksonville).  His father lives in Fernandina, and is the former owner of a trucking company and restaurant, and is now owner of Soutel Drive Properties, which is a trucking terminal rental agency for about 13 trucking businesses.

Mr. Camp has two siblings – a brother and a sister.  His brother, Wesley Camp, works for the Jacksonville Sheriff's Office, as a Patrol Officer.  His sister, Layn Alderson, lives in Boca Raton, and works for Chartwells, at Florida Atlantic University, as the Director of Marketing and Guest Experience.

6.   Wife

Mr. Camp married Gretchen Camp on January 15, 2005.  They have been married for 16 years.  Mrs. Camp is a co-conspirator (indeed, the lead conspirator) in

3

crimes for which Mr. Camp is charged.  As confirmed by Mr. Camp's Superseding Information and his Plea Agreement, he has cooperated with the government in their investigation, which, of course, means he has, and will, provide truthful testimony about her conduct, as an accountant with Swisher.  They expect to get a divorce.

7.    Education

Mr. Camp graduated from Greenwood School in 2001, which, as confirmed by their website, is a school for children that have been diagnosed with special needs (these days referred to as "learning differences").[2]  This, of course, must be juxtaposed with Gretchen Camp, who obtained a college degree, and has no learning disabilities, or Tourette's syndrome.

Mr. Camp also attended one year at Florida Community College at Jacksonville, in 2003, but never finished.

---

[2]  The website reports the school caters to students who may often experience (1) difficulty with organization skills and/or focusing their attention for sustained time periods (and thus are often diagnosed with Attention Deficit/Hyperactivity Disorder), (2) difficulty "keeping up" with presentation of new information, (3) difficulty in knowing how to communicate material and information to others, or (4) experience awkwardness and/or anxiety in social situations (and may have been diagnosed as Autism Spectrum Disorders, such those who would have formerly been diagnosed as Asperger's Syndrome or Pervasive Developmental Delay), (5) difficulty processing mathematical facts, formulas, and applications (perhaps diagnosed with Dyscalculia), (6) difficulty with writing (perhaps diagnosed with Dysgraphia), (7) difficulty with the mechanical processes of reading printed text (often diagnosed with Dyslexia), and/or (8) who struggle with organizing their belongings, assignments, schedules, and other such matters.

8.     Employment

Mr. Camp previously held two jobs, prior to his original December 14, 2019 state arrest.  He was working as a Manager for TSX Intermodal, which is a start-up company, where Mr. Camp hired employees, worked sales, and assisted with dispatching, recruiting, rates, and safety issues.  Mr. Camp was also working for his father at Soutel Drive Properties, as a guard, on Monday and Tuesday nights, and then also for 12 hours a day on Saturday's and Sunday's.  Upon his release, it is expected his father will assist Mr. Camp in securing employment, again, in the trucking industry.

9.     Lack of Criminal History

Importantly, Mr. Camp has no criminal history whatsoever – prior to his December 14, 2018 arrest, by the State, in what is, of course, this case.  Here, the government has, in essence, "adopted" the state case, with our consent and request. As a "first time offender," Mr. Camp is certainly entitled to the type of consideration and leniency afforded to first time offenders.

C.     Cooperation

10.     Mr. Camp has been cooperating with the federal authorities, as evidenced by his waiver of indictment and his cooperation plea agreement.

11.     In addition, consistent with Mr. Camp's cooperation agreement with the

5

government, and out of respect to the victim, Mr. Camp cooperated with counsel for Swisher's carrier, and on September 3, 2020, a Stipulation for Settlement was filed, in which Mr. Camp agreed to the full restitution amount.  Exhibit A.  On September 8, 2020, Circuit Court Judge Gary Wilkinson entered a Final Judgment.  Exhibit B. Indeed, the settlement sum was identical to the sum Mr. Camp agreed to in his plea agreement.

12.     In addition, counsel for Swisher's carrier amended his complaint to add John Garrard (the coconspirator from Atlanta who laundered some $3M in funds) and the owners and operators of Howard Pawn and Jewelry Shop, located in Georgia, owned by Howard Reed.  Mr. Camp cooperated with the carrier in providing a factual basis for adding those defendants.

13.     Indeed, that cooperation has recently been further acknowledged by counsel for the carrier.  Attached as Exhibit C is a May 20, 2021 email from counsel for Swisher's carrier, acknowledging the cooperation of Mr. Camp in his efforts to hold the pawn shop / Reed defendants accountable for a portion of the fraud.[3]  Those defendants had sought to dismiss the complaint, on jurisdictional grounds (i.e., their store is in Georgia).  However, as counsel reports:

---

[3] The PSI addresses the "fake invoices" to the "Pawn Shop" in question, at ¶34 (totaling $126,260).

> As to the Great American lawsuit, you are aware of the judgments already entered.  I am now in the process of discussing <u>settlement with the Reed defendants</u>. The fact that the Court determined there is personal jurisdiction over the Reed defendants, in my opinion, is what likely facilitated the settlement dialogue.  The <u>affidavit that your client, Richard E. Camp, provided was instrumental</u>, <u>if not the reason</u>, for being able to <u>defeat</u> the <u>Reeds' claim</u> that <u>Florida lacked personal jurisdiction over them</u>.

(emphasis added).

14.    The level and magnitude of Mr. Camp's cooperation has been remarkable.  At the sentencing hearing, counsel will produce additional exhibits demonstrating that level of cooperation. Conversely, counsel is unaware of any assistance Gretchen Camp has given to counsel for the carrier, with regard to their pursuit of the other culpable parties.

D.    <u>PSI Objections</u>

15.    <u>¶29 – "Ways to Continue the Scheme"</u>

This paragraph overstates the way in which checks to Lodge and Anchor, the Pawn Shop and First Coast Auto Diesel Repair came about.

It is true that Mr. Camp "often asked when the next wire transfer would be coming,"  and "when the checks would resume." Factual Basis at 31.  However, <u>Gretchen</u> came up with the idea to write checks to the auto repair company. *Id*. Mr. Camp did suggest a check to the pawn shop, and they mutually agreed checks would

7

be sent to Lodge and Anchor.  Factual Basis at 31-32.

16.    ¶38 – "Fake Invoice to EAS"

This paragraph has been revised to state "the conspirators agreed to cause a fake invoice to be sent to EAS."  However, it should be clearly understood that Mr. Camp had <u>no involvement</u> with any internal invoices, checks, or approvals within Swisher, and that <u>Gretchen</u> sent the fake invoices.  Of course, we agree Mr. Camp benefitted from it, but we certainly don't want any misunderstanding as to his limited role.

17.    ¶39 – "R. Camp Withdrew Lodge and Anchor Funds"

The first line of this paragraph states that "R. Camp and Garrard withdrew the funds from the Lodge and Anchor account."  We understand Mr. Camp ultimately received checks from Lodge and Anchor, but this sentence makes it sound like he had signatory or other authority over the Lodge and Anchor Account.  He did not.

18.    ¶51 – "Sophisticated Means"

We certainly understand the reason for considering application of this enhancement, given the nature of this crime.  However, respectfully, to properly ascertain if this adjustment applies to <u>Mr. Camp</u>, it is essential to draw a distinction between the conduct of conspirator Gretchen Camp – with that of her husband, Richard Everett Camp.

To assist the Court in addressing that consideration, we will first reference USSG §2B1.1(b)(10), and its Application Note 9.(B), and then we will turn to a factual analysis of that section and the corresponding commentary note.

     a.   <u>USSG Guidance</u>

Application Note 9.(B) explains that "sophisticated means" –

... means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.

It thereafter lists examples, including the following:

     (1)   "telemarketing scheme"

Of course, that example does not apply here.

     (2)   "Conduct such as hiding assets or transactions or both"

As we know, here, no such assets were hidden, so this example does not apply.[4] Indeed, all the assets were put in their own names, whether it be the real estate (the Georgia farm and the Fernandina Beach condo, as well as their marital home in Yulee) or the bank accounts. Indeed, the PSI correctly list all of these assets in PSI ¶¶5.c through 5. j). The real estate is all public record. The bank accounts (BOA and PNC) were readily identified by simply tracing the deposits of the checks Gretchen

---

[4] The Addendum to the PSI relies on this "hiding assets" term. Doc. 37 at 24. However, the funds that were sent to Lodge and Anchor were the means by which the funds were embezzled – not the means of "hiding" those assets after the embezzlement. Thus, respectfully, this is not a proper application of this term.

had issued.

(3)   "Fictitious entities"

The "hiding assets" example obviously requires, as a predicate, the "hiding" of assets.  As just noted, that is not the case here.

Moreover, the Application Note does not suggest an adjustment for "hiding assets" – <u>unless</u> that is accomplished "through the use of fictitious entities, corporate shells, or offshore financial accounts."  In other words, this example requires not only the hiding of assets, but that such "hiding" has been accomplished through a "sophisticated" means, such as "through the use of fictitious entities, corporate shells, or offshore financial accounts."

However, here, there are no such fictitious entities.[5]  It is true that <u>Gretchen</u> (but not Mr. Camp) issued checks to entities that may not have been entitled to the funds, but they were real entities.  Lodge and Anchor was real entity.  PSI ¶¶31-33.  The Pawn Shop was real entity.  PSI ¶34.  First Coast Diesel Auto Repair (albeit misspelled) was real entity.  PSI ¶¶35-36.

We note that the commentary of the Guidelines, and its examples, are binding on the Court.  *United States v. Reese*, 67 F.3d 902, 908 (11th Cir. 1995).  Thus, we

---

[5]  The Addendum to the PSI relies (incorrectly) on this "fictitious entities" term.  Doc. 37 at 24.

10

respectfully submit this analysis of the examples should be used as a barometer to gauge application of this enhancement – to Mr. Camp.  Respectfully, that barometer confirms the adjustment does not apply to him.

Of course, it is required that the application of the Guidelines be particularized to any specific defendant.  Hence, this next section will provide a detailed factual analysis – first of the conduct of Gretchen, and then of Mr. Camp.

> b.   Factual Analysis – Conduct of Gretchen

Turning to the facts that explicate the charged crime, it cannot be gainsaid that Gretchen was the actor who committed all of the acts essential to accomplishing this embezzlement.  More to the point, she committed all of acts that involved any conduct that was "sophisticated."

One need look no further than the allegations in the Superceding Information, to comprehend her overarching role in the conspiracy.  The following sections will recite (and quote, verbatim) the key allegations, applicable to each of the three counts:

Count One  (the tax refund fraud)

> (1)   ¶A.2 – "G.C.[6] became the Senior Tax Accountant for Swisher."

---

[6] "G.C.," of course, is Gretchen Camp.

(2)     ¶A.2. – "As part of G.C.'s job responsibilities, G.C. was authorized to prepare and submit claim forms relating to the refund to Swisher of federal tobacco excise taxes and to approve certain payments to be made by both Swisher and its sister company, E-Alternative Solutions (EAS)."

(3)     ¶C.8.a. – "It was part of the conspiracy that G.C. would and did prepare and submit tax forms for G.C.'s employer, Swisher."

(4)     ¶C.8.b. – "It was further part of the conspiracy that G.C. would and did materially alter and change the tax forms that G.C. submitted on behalf of G.C.'s employer so that the tax refunds due and owing to Swisher were diverted to BOA 2165."

(5)     ¶C.8.c. – "It was further part of the conspiracy that G.C. would and did materially alter and change a tax form that G.C. submitted on behalf of G.C.'s employer so that the tax refund due and owing to Swisher was diverted to PNC 8074."

(6)     ¶C.8.d. – "It was further part of the conspiracy that G.C. would and did, on some of the tax forms for G.C.'s employer, check the box designated "Allowance of Credit for Tax" and, after securing a signature from G.C.'s supervisor on the form, fraudulently and falsely alter the form by removing that check and then checking the box, "Refund of Tax."  G.C. would and did then list BOA 2165

12

on the form as the account into which the refund should be deposited."

(7)     ¶C.8.e. – "It was further part of the conspiracy that, in other instances, G.C. would and did check the box labeled "Refund of Tax" on the claim form for G.C.'s employer and then falsely and fraudulently identify BOA 2165 as the account into which the refund should be directed."

In short, as to Count One (the tax refund fraud), every step necessary to commit this crime (and every "sophisticated" step) – was committed by Gretchen.  In reality, she didn't even need a co-conspirator to commit this crime.

Count Two  (the false invoices fraud)

(8)     ¶C.5.a. – "It was part of the conspiracy G.C. would and did create and caused to be created materially false and fraudulent invoices submitted to Swisher and EAS purportedly from Lodge and Anchor or Pawn Shop, which invoices requested payment for services and/ or goods that had never been provided to Swisher or EAS."

(9)     ¶C.5.c. – "It was further part of the conspiracy that G.C. would and did authorize payments from Swisher and EAS to Lodge and Anchor or Pawn Shop, as payment for the materially false and fraudulent invoices."

(10)   ¶C.5.h. – "It was further part of the conspiracy that G.C. caused a check to be issued to Pawn Shop by Swisher in response to the false and

13

fraudulent invoices, which check was mailed to Pawn Shop's primary business address in Macon, Georgia via the U.S. Mail."

Again, other than getting John Garrard to allow her to issue checks to his company, Gretchen could have committed this crime by herself. She could have set up her own (fictitious) company. She even fabricated the invoices for Lodge and Anchor, as noted in ¶C.5.a.

Count Three  (the money laundering count)

(11)   ¶B.3.a. – This paragraph "realleged and incorporated" the "allegations and information set forth in Paragraphs Five of Count Two." Thus, all of the actions perpetrated solely by Gretchen (listed above), are carried forward into this money laundering conspiracy count. Of course, as a matter of law, that count would not exist – but for the mail fraud allegations in Count Two – for which Gretchen was the architect, and, as noted, perpetrated all the "sophisticated" acts.

In short, as noted, and as exemplified by the Information itself, all the conduct undertaking to commit the fraud (and certainly all the "sophisticated" conduct) was perpetrated by Gretchen – not Mr. Camp.

c.   Factual Analysis – Conduct of Mr. Camp and his Lack of Sophistication

Next, we juxtapose the conduct of Mr. Camp with that of Gretchen, which

14

includes the following observations:

> (1)   He was never a Swisher employee.
>
> (2)   He had no access to any of the records of Swisher.
>
> (3)   He had no access to any of the financial data of Swisher.
>
> (4)   He never created a single false document.  Gretchen did all

of that.

> (5)   He had no accounting expertise.
>
> (6)   He had learning disabilities – including Tourette's

Snydrome.  PSI ¶¶74-75.

> (7)   He had mental health deficiencies.  PSI ¶¶80 and 118.

> d.    Conclusion

Thus, respectfully, whereas this adjustment might well apply to Gretchen, who, as noted, engaged in all the key aspects of the offense necessary to trick Swisher and obtain the funds, it should <u>not</u> apply to Mr. Camp, who never concealed anything from Swisher, never worked for them, and did none of the "sophisticated" acts or conduct, within the Swisher operation, to obtain the funds.

> 19.   <u>¶52 – "Base Offense Level"</u>

Please see our objections with regard to PSI ¶51 (sophisticated means). Removing those 2 points will result in a 2 point reduction for this paragraph.

20.    ¶53 – "§1956"

Mr. Camp, in anticipation of a prosecution of John Garrard, was required by the government to plead to Count Three, which charged a Conspiracy to Money Launder – which dealt with the funds that were laundered by Garrard.

However, the United States has elected to not prosecute Garrard, such that, in hindsight, a plea to this count was not necessary.

Moreover, and importantly, it must be noted that Gretchen was not required to plea to Count Three – even though she was the one who sent Garrard the money, and she was the principal conspirator and she issued the checks to Garrard's companies. Indeed, her Factual Basis (at pp. 30-32 – Doc. 18[7]) recites the identical facts framing the Lodge and Anchor money laundering conduct – including the "48 fraudulent invoices for Lodge and Anchor to Swisher and 10 fraudulent invoices from Lodge and Anchor to EAS" – which form the predicate for the money laundering allegations. Those were her fraudulent invoices – all created by her (not Mr. Camp) – for the express purpose of embezzling the funds and laundering them through Garrard's company.

Thus, whereas we respectfully submit it would be appropriate for the

---

[7] *United States v. Gretchen Michele Camp*; Case No.: 3:21-cr-9-HES-JRK; Plea Agreement (Doc. 18).

government to drop that Count Three, we do ask that the Court determine that the addition of this count, and its two-level increase:

a.  overstates the seriousness of this count – in no small part because Count Two and Count Three are really the <u>same conspiracy</u>, but were separated into two counts, for the convenience of the government in the anticipated prosecution of Garrard;[8]

b.  overstates the seriousness of the Guidelines (by creating an unnecessary additional count and conviction); and

c.  represents an unnecessary and inappropriate sentencing <u>disparity</u>, as juxtaposed with the three conspirators.  As noted, (1) Gretchen did not have to plea to such a count, and (2) Garrard will not have to plea to any count.

d.  The PSI relies on the money laundering count to defeat some of our mitigation arguments.  See the Addendum at 3.

Thus, and respectfully, the appropriate manner in which to cure this disparity is to remove those two point.

---

[8] As we know, conspiracies can have multiple objects.  Thus, Count Two and Three could easily have been charged in a single conspiracy, with two objects – embezzlement and laundering the embezzled funds.

21.    ¶55 – "Role in the Offense"

We respectfully object to not giving Mr. Camp a mitigating role. The factual grounds in support of that request are set forth in our objections to the ¶51 – "Sophisticated Means" – set forth in ¶14 above. As we point out in addressing that paragraph, all acts constituting "sophisticated means" were perpetrated by Gretchen – not Mr. Camp – as to the factual and legal issue that goes to the heart of this case, that is, the embezzlement charge.

Respectfully, those same undisputed facts[9] demonstrate Mr. Camp's entitlement to a mitigating role, in the "criminal activity" of embezzlement – for the undisputed reason that Gretchen handled all the actual acts of embezzlement. Mr. Camp helped her spend the money – but her conduct was the sole cause of the actual embezzlement from Swisher.

U.S.S.G. §3B1.2 focuses on the "defendant's role in the offense." Here, the heart of the offense, and the underlying "criminal activity," is the embezzlement from Swisher. On that issue, not only was Mr. Camp a "minimal" or "minor" participant – but he was not a "participant" at all – in the actual embezzlement.

His participation was in spending the funds. Even the laundering was effected

---

[9] They have to be undisputed, since we quote, *verbatim*, from the Superceding Information, authored by the government.

by Gretchen sending checks to John Garrard, and his company, Lodge and Anchor.[10]

Application Note 3(C) confirms this issue is a "Fact-Based Determination."

We quote that provision, as follows:

> **Fact-Based Determination.** – The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.
>
> In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:
>
> (i)   the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)  the degree to which the defendant participated in <u>planning or organizing the criminal activity;</u>[11]
>
> (iii) the degree to which the defendant exercised <u>decision-making authority</u> or influenced the exercise of decision-making

---

[10]   The PSI Addendum asserts it is proper to consider Mr. Camp's "role in money laundering" to deny this downward role adjustment.  Doc. 37 at 25.  First, as noted above, this Count 3 is an albatross that should no longer be hung around Mr. Camp's neck, such that this PSI analysis, in fairness, should not be applied. Second, even focusing on the money laundering count, as we have demonstrated above, <u>all</u> the acts that put the Swisher funds in Lodge and Anchor were undertaken by Gretchen – not Mr. Camp.  Thus, he is still entitled to a mitigating role adjustment.

[11]   Mr. Camp had nothing to do with how Gretchen planned or organized the embezzlement.

authority;[12]

(iv)  the nature and extent of the defendant's <u>participation in the commission of the criminal activity</u>, including the acts the defendant performed and the responsibility and <u>discretion</u> the defendant had in performing those acts;[13]

(v)   the degree to which the defendant stood to benefit from the criminal activity.

(emphasis added).

Thus, on three of the five factors, Mr. Camp essentially scores a zero, such that, factually, he is a proper candidate for a role reduction.

22.   ¶57 – "Adjusted Offense Level"

Please see our objections with regard to PSI ¶¶51 and 53.  Removing the 2 points (each) from those paragraphs will result in a 4 point reduction for this paragraph (to Level 25).  Similarly, granting Mr. Camp a role reduction will further reduce this figure.

23.   ¶61 – "Total Offense Level"

See our comments with regard to PSI ¶57.  With the subtraction of 3 points for

---

[12]  Gretchen made <u>all</u> the decisions as to how to perpetrate the embezzlement.

[13]  It is undisputed that the "criminal activity" of embezzlement was unilaterally conducted but Gretcen, and he had no "participation" in that conduct, and she was the sole person "performing those acts," and had the sole "discretion" to do so.

acceptance of responsibility, and granting our objections to ¶¶ 51 and 53, ¶61 should

be a Level 22.  Similarly, granting Mr. Camp a role reduction will further reduce this

figure.

24.    ¶65-66 – "Other Criminal Conduct"

These two paragraphs reference the prior state case.  However, this federal case

is that state case.  Thus, these paragraphs should confirm this state case has been

incorporated into the current federal case (by agreement of the defense, and both the

state and federal prosecutors).

E.    Departures and Variance Grounds

25.    First time offender

Mr. Camp is a first time offender.  As such, traditionally, such persons are

considered as good candidates for a more lenient sentence.

26.    Stable residence

Mr. Camp will be able to have a permanent residence,  upon his release, in

property purchased with inheritance funds.

27.    Minor role

As compared to the conduct of wife (see our PSI objections as to PSI ¶51), Mr.

Camp's conduct is dramatically less.  Thus, even if the Court should elect to not

afford him a mitigating role adjustment, her much more nefarious conduct warrants

a lesser sentence for Mr. Camp.

28.   Learning and mental health disabilities

The PSI at ¶¶74-75, 80 and118 confirm Mr. Camp suffers from learning and mental health disabilities, which warrant a more lenient sentence.

29.   Health

The PSI at ¶77 confirms Mr. Camp suffers from health issues (hypertension, high cholesterol, kidney disease) which warrant a more lenient sentence.

30.   Incarceration in multiple local jails

Unlike Gretchen and Garrard, Mr. Camp has spent some two years in local county jails.[14]  And he did so to honor the request of the government.[15]  With all due respect to those facilities, they are a far cry from the quality and conditions of federal prisons.  This is a strong mitigating factor, to stay in custody, in various local jails, instead of serving time in a federal prison.  Those harsh conditions should translate into an appropriate multiplier.  Respectfully, two years in county jail should translate

---

[14]  Mr. Camp has been shuttled and housed in a great many of such facilities, including Nassau, Duval and Baker County Jails.

[15]  As noted, the government, as part of the negotiations to adopt the state case, requested that Mr. Camp agree to not ask for conditions of release. Counsel is confident he would have been entitled to such conditions (just like his wife).  Thus, waiving that right, which has led to another year in federal custody, is a substantial factor in support of Mr. Camp receiving consideration for agreeing to incarceration in a much more difficult institutional environment.

into four years of federal prison time.

This is all the more true since Gretchen, the arch-conspirator – has been out on bond, living in a condo at the beach, purchased with funds she stole, and, other than a couple of days at the time of her original arrest (until bonded out by Mr. Camp), she has never stepped foot in a county jail.[16]  Moreover, she will be permitted to report directly to a federal institution, and never experience the physical and health dangers and conditions of local county jails – all of which Mr. Camp has had to endure for the last two years.

Of course, we remain in the midst of a national pandemic – and Mr. Camp agreed to remain incarcerated right in the middle of the worst of it.  That stressful health factor further demonstrates his two years in county jail should count as four years in federal prison.

31.     Garrard – disparate disposition

As noted in our comments to PSI ¶53 (our ¶16), the express purpose for requiring Mr. Camp to plead to Count Three (the money laundering count) – was the expectation he would testify in a prosecution of Garrard – who laundered the funds

---

[16]  This is the very condo the federal informations and plea agreements of Gretchen and Mr. Camp require to be forfeited.  However, Gretchen has had ocean views for the last two years while Mr. Camp has had a view of multiple county jail walls, been exposed to COVID, and has been assaulted.

through his company.  As the Court is aware, multiple continuances were granted of the sentencing, to permit Mr. Camp to consummate his cooperation with the government.

However, the government has elected to <u>not</u> prosecute Garrard.  Rather, they have agreed to accept him into the very rarely used federal PTI program – which means Garrard – who accepted <u>48 fraudulent checks</u> and laundered <u>$3,366.924.97</u> (Camp Factual Basis at 33-34), and kept around $400,000 of those funds –  will (1) not be prosecuted at all, (2) will not have a felony conviction, and (3) will not spend a single day in jail (or federal prison).

Clearly, as manifested by the Factual Basis for both Mr. Camp and Gretchen, Garrard is *pari delecti* with them, as to the money laundering conduct, and yet, he will face no prosecution at all.

Respectfully, given the decision of the government to so exercise their prosecutorial discretion, Mr. Camp should receive a time-served sentence.  Any other sentence would represent an even greater "unwarranted sentence disparities," which the law abhors.  *See* 18 U.S.C. §3553(a)(6).[17]

---

[17]  *See also* the Opinion and Order in the *Ferguson* case, a copy of which is attached hereto as Exhibit D.  In that case, former President Trump granted clemency to a corrupt former Mayor of Detroit, from a lengthy sentence.  Due to the sentencing disparity that resulted, the federal judge reduced the sentence of the less-culpable codefendant to time-served.  By giving Garrard a PTI agreement, the government has

32.    Restitution

We note that restitution is not a ground for "departure."  USSG 5K2.0(d)(5).

However, it is a perfectly valid ground for the Court to consider a variance.  Here, not

only has Mr. Camp agreed (in his plea agreement) to make restitution, but he has

done so Great American Insurance Company (the carrier for Swisher), and cooperated

with their civil suit, accepted service, and executed a stipulation for the principal

amount (in the same amount as set forth in the Plea Agreement).  Exhibits A and B.

F.    Credit for State Time

33.    As the Court is aware, Mr. Camp's federal case commenced as a state

case.  Pursuant 18 U.S.C. §3585(b), "A defendant shall be given credit ... for any time

he has spent in official detention prior to the date the sentence commences – ... (1) as

a result of the offense for which the sentence was imposed."

34.    The government agrees that provision applies to Mr. Camp, and thus he

is entitled to credit for all the time he spent in state custody, prior to the adoption of

his state case in federal court.[18]

_____

effectively granted clemency to Garrard, thus automatically creating a tremendous
sentencing (and prosecution) disparity, justifying a time-served sentence for Mr.
Camp.

[18]  Mr. Camps first state arrest was on 12/13/18 (Nassau County, and booked
in Duval the next day), with a release on 12/15/18, for a total of 2 days credit.
Composite Exhibit E.  His second state arrest (with the alleged money laundering

G.                         **MEMORANDUM OF LAW**

35.    *United States v. Singletary*, 649 F3d 1212, 1217 (11th Cir. 2011),

quoting *United States v. Sepulveda*, 115 F3d 882, 890 (11th Cir. 1997), stated that,

"When a defendant challenges one of the factual bases of his sentence ... the

Government has the burden of establishing the disputed fact by a preponderance of

the evidence."   That burden certainly lies with regard to any dispute as to loss

amounts.  *Singletary* at 1216-1217.

36.    *United States v. Watts*, 519 U.S. 148 (1997), at 156, held:   "The

Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by

a preponderance of the evidence."

37.    *United States v. Averi*, 922 F.2d 765, 766 (11th Cir. 1991), holds that

"the preponderance of the evidence standard necessary to establish relevant conduct

before that conduct could be considered in sentencing under pre-guidelines law

remains the standard of proof required under the guidelines."

38.    Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the sentencing

guidelines are <u>advisory</u> only, and the court has discretion to impose a sentence below

---

counts – for posting bond for his wife) was on 6/18/19.  He has remained in
continuous custody since then, since, when he entered his federal plea on 7/22/20,
Mr. Camp was required to consent to not asking for conditions of release.  The Court
will note, from Composite Exhibit E, while Mr. Camp pled in federal court on
7/22/20, he was not released from state custody (into federal custody) until 7/29/20.

any guidelines range determined by the court, as well as to consider a variance. Thus, although Ms. Brown's Sentencing Memorandum has addressed various grounds for departure, Ms. Brown respectfully requests the Court consider them (and the variance grounds) not only as traditional grounds for departure, but as grounds supporting the Court's exercise of discretion, after ascertaining the guideline range.

39. Indeed, not only are the Guidelines merely advisory only, but any presumption that a sentence imposed within the Guidelines is "reasonable" – is error. *Nelson v. United States*, 555 U.S. 350 (2009). *Nelson* held that:

> The Guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed</u> reasonable.
>
>           * * *
>
> Under our recent precedents, [applying a presumption of reasonableness to the Guidelines] constitutes error.

*Id.* at 351.

40. Thus, the Court is authorized, and indeed, respectfully, required, to impose, and Mr. Camp is entitled to have imposed, a sentence that "is appropriate for the individual defendant in light of the statutory sentencing factors [of] 18 U.S.C. § 3553(a)." *Id.*

41. The Sentencing Commission has commented on "the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range

of human conduct potentially relevant to a sentencing decision."  Accordingly, the

Commission has empowered judges to employ "downward departures" as a means for

imposing sentencing below the guideline sentencing range.  As the Supreme Court

has confirmed, the Sentencing Guidelines "place essentially no limit on the number

of potential factors that may warrant a departure."  *Koon v. United States*, 518 U.S.

81, 106 (1996).

WHEREFORE, it is respectfully requested that Mr. Camp be given a time-

served sentence.

Respectfully submitted,
**FALLGATTER CATLIN**
**& VARON, P.A.**
  /s/ Curtis S. Fallgatter
Curtis S. Fallgatter, Esq.
Florida Bar No:  0213225
200 East Forsyth Street
Jacksonville, Florida  32202
(904) 353-5800 Telephone
(904) 353-5801 Facsimile
e-mail: fallgatterlaw@fallgatterlaw.com
Attorneys for Defendant

Exhibits

A.   Stipulation for Settlement – Swisher civil suit
B.   Final Judgment – Swisher civil suit
C.   May 20, 2021 email from counsel for Swisher's carrier (acknowledging the cooperation of Mr. Camp in his efforts to hold the pawn shop / Reed defendants accountable for a portion of the fraud)
D.   Opinion and Order in *Ferguson* case
E.   JSO Information Inmate Search

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing, and the exhibits hereto, have been furnished electronically to: (1) Frank Talbot, Esq. (Frank.M.Talbot@usdoj.gov), (2) Bonnie Glober, Esq. (Bonnie.Glober@usdoj.gov), Office of the United States Attorney, 300 N. Hogan St., Ste. 700, Jacksonville, FL 32202, and (3) Ms. Irish Anderson, U.S. Probation Office (by email: irish_anderson@flmp.uscourts.gov), this 21st day of May, 2021.

      /s/ Curtis S. Fallgatter
ATTORNEY

106095(6)