UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          Case No:  3:20-CR-95-J-39MCR

RICHARD EVERETT CAMP, JR.
_____/

**SENTENCING MEMORANDUM – "ABUSE" CLAIMS OF GRETCHEN**

    COMES NOW the Defendant, Richard Everett Camp, Jr., by and through his

undersigned counsel, and hereby files this Sentencing Memorandum – "Abuse"

Claims of Gretchen, responding to claims of abuse, asserted by counsel for Gretchen

Camp, and in support thereof, states as follows:

**TABLE OF CONTENTS**

A.    Introduction
B.    Legal Predicate for Claimed Relief – Flawed
C.    Gretchen Memorandum – Unsupported and/or Fabricated
D.    Three Sentencing Witnesses – Analysis
E.    No Temporal Relevance to Swisher Fraud
F.    Gretchen – Admitted to Being the Mastermind
G.    Gretchen's Admission She Initially Hoodwinked Her Husband – Accurate
H.    Fabricated Defense – Warrants Loss of Acceptance of Responsibility

**MEMORANDUM**

A.    Introduction

    1.    On the very eve of her May 20, 2021 sentencing hearing, counsel for

Gretchen Camp filed a Sentencing Memorandum (hereinafter, "Gretchen Sentencing Memo"),[1] and exhibits totaling <u>599 pages</u>, employing a strategy, flawed in fact and law, in order to seek a more lenient sentence for Gretchen Camp, by claiming that her embezzlement was the product of being an abused wife.

2.     That strategy was apparently perceived to be a necessity (at least by her counsel), given the fact that Gretchen Camp (1) was the mastermind of the Swisher embezzlement conduct (as <u>admitted</u> by her in the Factual Basis to her own Plea Agreement), (2) she had a college education whereas Mr. Camp graduated from a high school for persons with disabilities, (3) she had the position of trust, skill and knowledge, (4) she informed countless persons her fraud was commenced by initially hoodwinking her husband (and others) into thinking she was getting "bonuses" – and concealing from him that she was engaged in fraud (let alone that she did so at the insistence of Mr. Camp), and (5) her attorneys knew the "cat was out of the bag," and thus they had to come up with a strategy (albeit defective) to try to neutralize that truth, and seek to mitigate the harsh reality of her role as the arch-conspirator.

3.     Counsel understands the Court, rightfully, wants the position of Mr. Camp as to these bizarre claims.  Hence this supplemental sentencing memorandum is filed, addressing the abuse claims.

---

[1]  Doc. 37 in MDF Case No. 3:21-CR-9-BJD-JKR.

B.     Legal Predicate for Claimed Relief – Flawed

4.     After concluding their 55 page diatribe about Mr. Camp, counsel recited a single case in support of the claim that Gretchen Camp is entitled to a sentence reduction for the alleged "emotional and physical abuse," citing *United States v. Gaviria*, 804 F.Supp. 476, 479 (E.D.N.Y. 1992).  Gretchen Sentencing Memo at 44.

5.     As aptly pointed out by the government, during the May 20, 2021 sentencing hearing, that case could not be more inapplicable to the facts at hand – even if the "facts" asserted by counsel for Gretchen Camp were accurate.

6.     Given the fact the single case relied upon by counsel for Gretchen Camp does not come close to supporting their position, presumably, an analysis of the "factual" claims is unnecessary.  However, counsel will do so.

C.     Gretchen Memorandum – Unsupported and/or Fabricated

7.     The 55 page Gretchen Sentencing Memo, as with all pleadings, is not evidence.  It consists of a diatribe of wild accusations.[2]  What then did her counsel provide to the Court as proof of these claims?

8.     There are two categories:  (1) the exhibits attached to the Memo (consisting mostly of voluminous text messages) and (2) the three witnesses called

---

[2]   Among them is the nonsense that Mr. Camp pointed a gun at Gretchen. Gretchen Sentencing Memo at 20.  Gretchen had a concealed weapons permit and a target in the garage to practice shooting.

at the sentencing hearing.  This Part C of this memorandum will address the text messages and the so-called "Abstract" of those texts (Exhibit C to the Gretchen Sentencing Memo).  Part D, *infra*, will briefly address the three sentencing witnesses.

9.     Counsel for Gretchen provided, as their Exhibit C, what they claim to be an "Abstract" of the text messages.  However, counsel's staff has thoroughly reviewed the text messages (contained in voluminous Exhibit D – consisting of 413 pages), and can find no substantial support for the entries in the so-called "Abstract." Of course, the "Abstract" fails to identify the page in Exhibit D that purportedly coincides with the entries in the "Abstract."  Whether that failure to cross-index the "Abstract" was intentional or not, clearly, but for counsel's staff spending hours reviewing the 413 pages of text, it is nigh impossible to verify the accuracy of the "Abstract."  Counsel's best belief is that the "Abstract" is entirely unreliable.

10.     As can be seen by the strategy of counsel for Gretchen, their Memo is also designed to claim that Gretchen's repeated statements that she hoodwinked her husband were not true – even though they were.  To that end, Gretchen's counsel notes they informed undersigned counsel that "hoodwink" reality was not true. However, it is entirely true (as demonstrated in Part G, *infra*).

11.     Indeed, the eighth page of their own Exhibit D (p. 9 of 413, in their Doc. 37-4) confirms that Gretchen initially hoodwinked her husband.  She states in her text

to Mr. Camp:

> ... you had <u>no knowledge</u> of the <u>fake invoices</u> or that I was <u>manipulating the paperwork for the deposits</u>. <u>When you and John [Garrard] asked me on multiple occasions if the Swisher was really giving me the money, I told you yes</u>.

(emphasis added).

12.     Because Gretchen was represented by counsel, undersigned counsel had no communication with her. However, naturally, she and her husband kept communicating. Thus, when she gave him a statement, admitting that which she had put in prior texts, and what she had told countless others (including law enforcement) – that is, that she initially <u>hoodwinked</u> him – apparently, it became necessary for counsel for Gretchen to seek to insert undersigned counsel into some apparent conspiracy to get Gretchen to admit the "hoodwink" truth. That effort to neutralize her prior admissions led to yet further fabrication, as next discussed.

13.     The "Abstract," at 3-4 (Gretchen Doc. 37-3 at 4-5) has entries under the heading "January 13, 2019." The first entry at the top of page 4 states:

> I told Curtis that u agreed to sign a waiver Tuesday and me there [at CF's office] to sign the divorce and document ... Maybe you should find a new attorney.[3]

14.     However "Curtis" Fallgatter was not retained until March 28, 2019 –

---

[3] Please note this quote is verbatim from the "Abstract," including the bracket entry: "[at CF's office]." Presumably, the "CF" is a reference to Curtis Fallgatter.

some 10 weeks <u>after</u> this purported January 13, 2019 entry.  Apparently, someone on Gretchen's team was anxious to back-date undersigned counsel's participation.  More to the point, this is a prime example of the inaccuracy of this "Extract."

C.    <u>Three Sentencing Witnesses – Analysis</u>

15.    Importantly, whereas Gretchen Camp made a statement to the Court, she expressly declined to provide <u>any</u> factual support for the wild claims of her attorneys, regarding her alleged abuse.

16.    Thus, the only "evidence" offered at the hearing were the three witnesses – two of whom (Yeldell and Krop) were pure hearsay witnesses, regurgitating the defense strategy of Gretchen, and one was her college roommate (Alverez).

17.    As noted, neither "Christian counselor" Yeldell nor psychologist Krop had any first hand facts.  All they reported was the hearsay claims of Gretchen – claims made well after she had truthfully confirmed she hoodwinked her husband, and well after she developed a motive to fabricate an after-the-fact "abused wife" claim.[4]

---

[4] The defense attorneys for Grethen relied on "Christian counselor" Yeldell for the proposition that it was Gretchen's "Christian duty to 'honor' [Mr. Camp] and place his command above all others."  Gretchen Sentencing Memo, Doc. 37 at 9.  During her testimony, which undersigned counsel observed, Ms. Yeldell did not explain how that "duty" compared with the 7th Commandment:  Thou Shall Not Steal."  Also, Ms. Yeldell said Gretchen had a "flat effect" when she met her.  But, as the Court heard, during the active embezzlement, Gretchen was very outgoing, to all the Swisher folks,

18.     Witness Alverez gave only <u>one</u> example of Gretchen supposedly not "defying" Mr. Camp.  She related a visit Gretchen made with Mr. Camp, when they were staying at the Gaylord Hotel in Orlando.  Mr. Camp supposedly got upset about the parking, and informed the hotel staff he was checking out.  How is that event – which had nothing to do with Gretchen (and only involved Mr. Camp's dealings with hotel staff) – constitute proof of duress?  And is it really the position of Gretchen's attorneys that Mr. Camp checking out of a hotel justifies Gretchen embezzling $5.7M?[5]

19.     Importantly, <u>all three witnesses</u> acknowledged that any claims by Gretchen of physical abuse involved dates <u>after</u> her December 2018 arrest, and thus were immaterial to her embezzlement conduct during 2014-2018.  Dr. Krop, on cross examination by the government, also admitted that the "manipulation" really came <u>after</u> the arrest, and acknowledged that Gretchen lived in Florida (in the condo) and

_____

from whom she was embezzling.  The government reported those Swisher employees observed Gretchen to be "amazing, cheerful and smart."  Of course, a night in jail, and the prospect of facing such serious charges, can be expected to dull one's enthusiasm and "effect," and Ms. Yeldell met Gretchen during that depressing stage of her life.

[5]  The only other "facts" recited by Ms. Alverez about Mr. Camp's interaction (prior to the arrests) with Gretchen were his comments about her weight.  If that constitutes an excuse to embezzle $5.7M, then lots of clever crooks just need to get fatter, have their spouse criticize them, and then go embezzle a lot of money.

Mr. Camp lived in Georgia[6] – for most of the time during which Gretchen was embezzling the funds.[7]

20.     Attached as Exhibits F and G, respectively, are letters from Mr. Camp's mother and father, providing background information on Mr. Camp, and also commenting on the nonsense claims of abuse.  Mrs. Camp notes how Gretchen liked to take trips without Mr. Camp, including to New York City, Las Vegas, and to visit Ms. Alvarez in Orlando, and how Mr. Camp wanted to spend more time with his wife. "Christian counselor" Yeldell claimed Gretchen was so devoted to Mr. Camp that she would embezzle for him, and yet Gretchen took multiple trips without him, and lived in an entirely different state.  How does the Gretchen defense reconcile those facts with the "devoted Christian wife" claim? Clearly, they are inconsistent.

21.     In their closing comments, the government correctly informed the Court of their belief that there was not an evidentiary basis for the duress claim.

---

[6] Gretchen's counsel concede Mr. Camp, after moving to Georgia, "returned home only on weekends, and usually only for one night."  Gretchen Sentencing Memo at 23-24.  Thus, for years, Gretchen had 6 days a week to (1) stop the embezzlement, (2) file for divorce, (3) move into Hubbard House, or (4) otherwise distance herself from this fantasy "abuse."

[7] Of interest, Mr. Camp advises that counsel for Gretchen initially sent her to UF Health, in Gainesville, shortly after her December 2018 arrest – to the same mental health offices where Mr. Camp went for his Tourettes issues, and she informed Mr. Camp they said she was fine.  It appears a second opinion was required to mount this after-the-fact "abused spouse" defense.

E.     No Temporal Relevance to Swisher Fraud

22.     The Gretchen Sentencing Memo confirms the attached text messages were "from January 2019 through May 2019." Gretchen Doc. 37 at 34.

23.     Thus, those messages are <u>after</u> the arrest, and thus <u>years</u> outside the time frame of the conduct of Gretchen embezzling the funds from Swisher, which transpired between "September 2014, and continuing through and including in or about October 2018." Superseding Information at 3.  These texts did not start until <u>5 years</u> **after** Gretchen commenced the fraud.

24.     As the government pointed out at Gretchen's May 20, 2021 sentencing hearing, these texts – all of which are years <u>after</u> the embezzlement conduct – cannot possibly be relevant to the "abuse" claim.[8]

25.     Moreover, the record is clear that Gretchen had every opportunity to extricate herself.  She lived in a separate condo.  He lived in a different state.  She took multiple trips to see her college roommate, in Orlando – and that lady was a <u>state prosecutor</u> – to whom she could have reported the conduct, and/or extricated herself.

26.     Lastly, Gretchen, as part of her duties at Swisher, was a <u>volunteer at</u>

---

[8] The claim that Mr. Camp somehow broke into her condo is foolish.  Gretchen claims Mr. Camp was able to guess the code at the condo?  The truth is, she gave him the code (9221), which is the same code for his debit cards.  She said she wanted him to be able to access the home whenever he wanted (for romance).

Hubbard House (for several years), and sponsored some of the battered woman there. How then can her claims of being "abused" be credible, when she volunteered, for years, at the premier facility in Jacksonville, which assists battered women?  Clearly, she was immersed into their training and educational programs, which teach women how to avoid being abused.  Indeed, she counseled some of those women herself.

F.  Gretchen – Admitted to Being the Mastermind

27.  Our [traditional] Sentencing Memorandum (Doc. 44), at ¶18.b. (pp. 11-14) quotes from the Superseding Information, regarding the conduct attributable to Gretchen.  As that detailed analysis demonstrates (which we adopt and incorporate herein), it cannot be gainsaid that Gretchen was the mastermind of the embezzlement.[9]  Every act necessary to effect the embezzlement was committed by her.

28.  Gretchen's role, as the mastermind, must be juxtaposed with the conduct and background of Mr. Camp.  In that regard, here are the facts relevant to Mr. Camp:

(1)  He was never a Swisher employee.

(2)  He had no access to any of the records of Swisher.

(3)  He had no access to any of the financial data of Swisher.

---

[9]  The Factual Basis for the Plea Agreement for Gretchen is essentially identical to the Factual Basis for Mr. Camp.  Thus, under oath, she has acknowledged her role, and, clearly, that role was as the mastermind.

(4)    He never created a single false document.  Gretchen did all of that.

(5)    He had no accounting expertise.

(6)    He had learning disabilities – including Tourette's Snydrome.  PSI ¶¶74-75.

(7)    He had mental health deficiencies.  PSI ¶¶80 and 118.

29.    As the mastermind, it is all the more bizarre that Gretchen's counsel chose to assert this "abuse" defense.

G.    Gretchen's Admission She Initially Hoodwinked Her Husband – Accurate

30.    As noted in paragraph 11, above, the attorneys for Gretchen have submitted documents confirming Gretchen, herself, reported she initially hoodwinked Mr. Camp.

31.    Indeed, there is overwhelming evidence that is so, consisting of statements made by Gretchen, her texts, and statements she made to others. We will recite some of that proof, since it all the more demonstrates the falsity of the claims, made by her counsel, that Mr. Camp put her up to this, and even told her (with his high school degree from a school for handicapped students) how to do it.

32.    Attached hereto as Exhibit A is a Witness Statement of Gretchen Camp. In her statement, Gretchen confirms Mr. Camp's innocence and lack of knowledge

11

of her misconduct.  Key points of her statement include the following:

> Starting in late 2017, I created and submitted fraudulent invoices to Swisher when an ATF audit stopped the tax refunds temporarily.   These invoices were requesting Swisher to have checks made out to Lodge and Anchor, LLC.  Lodge and Anchor would then deposit the funds into my husband's and mine joint account.  I told my husband that Lodge and Anchor would need to withhold taxes.
>
> I told  my husband that the money was a <u>bonus given by Lou Caldropoli</u>, who was Senior Vice President of Finance at the time.  A couple of times, Everett asked me if Lou Caldropoli was <u>giving me the money</u> and I replied "yes."  Once I told my husband that he could call Mr. Caldropoli to confirm if he wished.  To the best of my knowledge, he did not call Mr. Caldropoli.
>
> <u>I did not tell Everett that I created invoices for the checks to Lodge and Anchor</u>.

(emphasis added).

33.    Of course, this exculpatory statement, in which she explains her simple "cover" story to trick Mr. Camp, is entirely consistent with what Gretchen has been saying from the moment of her arrest.

34.    In addition, she has communicated this honest report to multiple witnesses, and has personally communicated the substance of this statement on multiple other occasions, including in January 4, 2019, when she sent Mr. Camp a

witness statement, a copy of which is attached hereto as Exhibit B,[10] and states as follows:

> I, Gretchen M. Camp, want it known that <u>neither Richard Everett Camp Jr. nor John Garrord [*sic*] knew that I created invoices for the checks</u> from Swisher to Lodge and Anchor LLC.  When they questioned me regarding the legitimacy of the money, I told both of them that <u>Lou at Swisher was approving the checks</u>.

(emphasis added).[11]

35.     In addition to her witness statements, Gretchen and Mr. Camp have also had several text message conversations, in which Gretchen further confirmed that Mr. Camp had nothing to do with her embezzlement, did not know about the invoices, and that she never meant for Mr. Camp to be implicated in her schemes.  Extracts from some of those multiple text messages are attached hereto as Exhibit C.  The substance of them is as follows:

> I will come by next week after I go to the state attorneys office to drop off my statement.  It will just state exactly what I told them before – that <u>you had no knowledge of the fake invoices or that I was manipulating the paperwork for the deposits.  When you and John asked me on multiple</u>

---

[10]  This is also Exhibit E to the Gretchen Sentencing Memo.  Doc. 37-5, at 3.

[11]  Clearly, Gretchen prepared this statement, on her own.  If Mr. Camp had done so, he would not have misspelled the name of one of his best friends.  The name is John Garrard – not "Garrord."

<u>occasions if the Swisher was really giving me the money, I told you yes</u>.  If Jesse[12] thinks it will make a difference to your case to reiterate in writing what they have on the recording and what I told Lou, John, Bill and Chris at Swisher when they questioned me then so be it.

No matter who I have talked to during any of this, <u>I have never once said that you knew about the invoices, because you didn't, or that you made me do it, because again you didn't.</u>

(emphasis added).

36.    Gretchen was first prosecuted in State court.  At her initial interview

with the State Investigator Zipperer, she stated:

INVESTIGATOR ZIPPERER:  Did anybody <u>threaten you</u> to do this?

GRETCHEN CAMP:  No.

INVESTIGATOR ZIPPERER:   So your husband was aware that you were doing it?

GRETCHEN CAMP:  He was aware of the checks coming in and stuff.  He was <u>not aware of how I was doing it</u>.

INVESTIGATOR ZIPPERER:  Okay.

GRETCHEN CAMP:  He was more on the assumption that, for better or for worse, that **the company was allowing it**.

---

[12]   "Jesse" is a reference to Jesse Dreicer, Mr. Camp's attorney, prior to retaining Fallgatter.  Dreicer recommended Mr. Camp retain the Sheppard firm for Gretchen, which he did.

INVESTIGATOR ZIPPERER:  Yeah?  So –

GRETCHEN CAMP:  But he just wanted money, and I saw the opportunity.  He never really asked how.

INVESTIGATOR ZIPPERER:  Uh-huh.  So he was aware of it, but he didn't get into the minutia with you –

GRETCHEN CAMP:  No.

INVESTIGATOR ZIPPERER:   – exactly what was going on or how it was occurring?

GRETCHEN CAMP:  No.

(emphasis added).

37.    John Garrard, the unindicted coconspirator in the money laundering activities, was interviewed, on January 18, 2019, and also informed the State Gretchen told him the funds came from "bonuses."

38.    It is not just in her own statements, and those she made to official law enforcement investigators, to whom Gretchen has admitted that she tricked Mr. Camp.  As noted, she has admitted her trickery to many others, and has apologized.[13]

39.    Attached hereto as Composite Exhibit D are Witness Statements from Jason and Katie Losco, who are childhood friends of both Mr. and Mrs. Camp, and

---

[13] Among other statements, Gretchen was telling people, including her parents, she was going to become a VP at Swisher – which reinforced the perception she was properly receiving large bonuses.

were also in Mr. and Mrs. Camp's wedding.  Katie Losco is also Gretchen's best friend.  They report that, on January 5, 2019 (after Gretchen's December 2018 arrest), Gretchen sent Mrs. Losco a text message, further confirming that Everett "had nothing to do with this despite what the papers say."  A copy of that text message is attached to Mrs. Losco's statement.

40.     Attached hereto as Composite Exhibit E are Witness Statements from Daniel and Michelle Walsh.  Mr. Walsh has been one of Everett and Gretchen's Youth Ministers, from when they were 13-18 years old, and Mrs. Walsh served alongside her husband.

41.     Between Christmas 2018 and New Years 2019, Mrs. Walsh stopped by Gretchen's house to speak with her.  During that meeting, Gretchen told Mrs. Walsh that she had "lost her way" and allowed greed and selfishness to overtake her, and that Gretchen felt really bad for doing this to Mr. Camp, since he had no idea she had been embezzling the funds.

42.     In addition, on January 1, 2019, via messages, Gretchen further sought out Mrs. Walsh's moral and religious advice, regarding her situation, stating that (1) the guilt of what Gretchen was doing was making it so she constantly had to take sleeping pills, so she could sleep at night, and (2) she made the huge mistake of trying to use money to solve her and Everett's marriage problems.  A copy of that message

16

is attached to their witness statements.

43.     Of course, counsel for Gretchen have had these very statements, <u>for the last two years</u>.  Indeed, they attached to their sentencing memorandum undersigned counsel's state motion to dismiss, which was filed on June 24, 2019.  Gretchen Memo at 37-7.  Exhibits F-J, attached to that state motion, are identical to Exhibits A-E attached hereto.

44.     Thus, Gretchen's counsel were well-aware of the overwhelming evidence that Gretchen initially hoodwinked Mr. Camp, which apparently (but rather inexplicably) led to the creation of the "abused" spouse defense.

H.     <u>Fabricated Defense – Warrants Loss of Acceptance of Responsibility</u>

45.     Mr. Camp wishes no harm to his wife, and certainly hopes the Court determines that she should receive a fair sentence.

46.     However, implicit in the defense fabricated by her counsel is that she should receive a more lenient sentence, and Mr. Camp a harsher sentence – notwithstanding her role as the mastermind, or the fact that <u>no embezzlement could have occurred but for her position at Swisher</u>, or the fact that she initially hoodwinked him, or the fact Mr. Camp has none of her educational or accounting expertise or advantages.

47.     Although, respectfully, to undersigned counsel's eye, and that of the

government, that ploy has fallen flat (and perhaps backfired), undersigned counsel would be remiss if he did not file this supplemental sentencing memorandum, addressing these bizarre claims.

48.     Truthfully, and as requested in paragraphs 18 and 21 of his Sentencing Memorandum (Doc. 44), Mr. Camp, for all the reasons recited therein, and as amplified herein, should receive a lesser sentence than Gretchen (apart and aside from the fact he has suffered pretrial detention for the last 2 ½ years in county jails).

WHEREFORE, it is respectfully requested that Mr. Camp be given a time-served sentence.

Respectfully submitted,
**FALLGATTER CATLIN**
**& VARON, P.A.**

  /s/ Curtis S. Fallgatter
Curtis S. Fallgatter, Esq.
Florida Bar No:  0213225
200 East Forsyth Street
Jacksonville, Florida  32202
(904) 353-5800 Telephone
(904) 353-5801 Facsimile
e-mail: fallgatterlaw@fallgatterlaw.com
Attorneys for Defendant

18

Exhibits

A.    Witness Statement – Gretchen Camp
B.    Witness Statement of Gretchen Camp on January 4, 2019
C.    Text messages from Gretchen Camp
D.    Witness Statements – Jason and Katie Losco – Composite
E.    Witness Statements – Daniel and Michelle Walsh – Composite
F.    Letter from Camp's mother
G.    Letter from Camp's father

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing, and the exhibits hereto, have been furnished electronically to: (1) Frank Talbot, Esq. (Frank.M.Talbot@usdoj.gov), (2) Bonnie Glober, Esq. (Bonnie.Glober@usdoj.gov), Office of the United States Attorney, 300 N. Hogan St., Ste. 700, Jacksonville, FL 32202, and (3) Ms. Irish Anderson, U.S. Probation Office (by email: irish_anderson@flmp.uscourts.gov), this 24th day of May, 2021.

  /s/ Curtis S. Fallgatter
ATTORNEY

106729(4)